## McNitt *v.* Philadelphia et al., Appellants.

Argued December 3, 1936. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*James Francis Ryan,* Assistant City Solicitor, with him *Joseph Sharfsin,* City Solicitor, for appellants.

*C. Brewster Rhoads,* with him *Edward G. Taulane, Jr.,* of *Montgomery & McCracken,* for appellee.

OPINION BY MR. JUSTICE MAXEY, January 11, 1937:

The appellee, who was an assistant fire marshal in Philadelphia, claims that as such he was a "policeman and fireman" within the meaning of the second paragraph of section 18 of Article XIX of the Charter Act of June 25, 1919, P. L. 581 (53 P.S., sec. 3338). As such he would not be subject to removal except for just cause, upon written charges, and after an opportunity to be heard in his own defense. The city claims that appellee

had only the status of "an officer, clerk or employee in the classified civil service" as defined in the *first* paragraph of section 18 of the Charter Act, supra, and that under its provisions he was subject to removal for "just cause" after "he had been furnished with a written statement of the reasons for such action, and been allowed to give the removing officer such written answer" as appellee desired. The latter concedes that if he had only the latter status, his removal from the position of assistant fire marshal on February 15, 1936, by the Director of Public Safety was legal. His status is the issue. The court below held that appellee was "both a police officer and a fireman" and that he was therefore entitled to a writ of peremptory mandamus to restore him to his position. The city appealed.

The Act of June 8, 1911, P. L. 705, creates the office of Fire Marshal in all cities of the first class and requires the Director of Public Safety to appoint such a number of assistant fire marshals as the city councils may allow. Their duties are to assist the Fire Marshal and his duties are: (1) to inspect all buildings and their contents and to report to the Director of Public Safety any faulty or dangerous condition found, (2) to investigate the cause of destructive fires, (3) to take and transcribe the testimony of all persons cognizant of any facts relative to fires under investigation, (4) "if he shall be of the opinion that there is evidence sufficient to charge any person with the crime of arson, or of conspiracy to defraud, or criminal conduct, in connection with such fire, he shall cause such person to be arrested and charged with such offense" and "shall furnish to the proper prosecuting attorney all such evidence, etc.," and (5) to summon witnesses to testify before him as to matters under investigation and to require the production of pertinent books and papers.

By the Act of February 2, 1854, P. L. 21, sec. 42, police and fire departments of the City of Philadelphia were provided for. The Act of June 1, 1885, P. L. 37,

set up the structure of the City Government of Philadelphia and provided that "no policeman or fireman shall be dismissed without his written consent (except by the decision of a court either of trial or of inquiry). . . ." By the Act of March 5, 1906, P. L. 83, sec. 20, policemen and firemen are treated as a class apart, and their appointment, promotion and dismissal were placed under the regulation of the Civil Service Commission. The present government of the City of Philadelphia is constitued under the Act of June 25, 1919, P. L. 581, supra.

The words "policeman" and "fireman" have not been defined by statute. It is a general rule that any "words of a statute will be construed in their ordinary sense and with the meaning commonly attributed to them, unless such construction will defeat the manifest intent of the legislature": 25 R. C. L., sec. 234, p. 988 (and cases cited).

The petitioner is not a policeman or fireman in "the ordinary sense" of those words. "Society and the criminal are at war," as Justice GIBSON once observed. In that war policemen are "at the front." Policemen are the guardians of the public safety. When "killers" and other felons are to be apprehended, the job is assigned to the police. The number of policemen slain in the performance of duty is proof that in Society's unending warfare against criminals, a policeman's post is one of danger. There are other officials "behind the line," doing work essential to the cause of law and order but they do not have the title or uniform or duties or hazards of policemen, are not publicly looked upon as policemen, and are not policemen. Fire marshals, mine inspectors, factory inspectors, boiler inspectors and milk inspectors are all charged with law-enforcing duties, but they help enforce laws affecting only *special* subjects, while a policeman's duty is the enforcement of *all laws* whose violation affects the peace and good order of the community.

A fire marshal, in addition to his inspection duties, has certain duties relating to the investigation of fires which may be of incendiary origin, but he is not required to arrest incendaries. His duty is to *cause* their arrest. But, on the other hand, a policeman's duty is to arrest not only incendaries but all other criminals whom he detects in the commission of crime, or whom he is ordered to arrest, or whom he has legitimate reasons for arresting. Furthermore, the application of physical force to law-breakers is no part of the duties of fire marshals; they can render efficient service regardless of whether or not they possess physical prowess. But the use of physical force is often a policeman's duty and if he failed to possess such force for use when needed, he would be disqualified for efficient service. If fire marshals possessed a title descriptive of their distinctive duties, they would be called fire investigators. They, like factory inspectors and mine inspectors, have important duties to perform in the enforcement of law and the protection of life and property, but their functions are not the functions of policemen. There is a close analogy between the functions of fire marshals and, for example, the functions of mine inspectors. The latter are charged, inter alia, with the duty to see that "every necessary precaution is taken to secure the safety of the workmen and that the provisions of the mining act are observed and obeyed." Their right and duty to "cause arrests to be made" for violation of the mining law are clearly implied, yet they are not policemen.

A fire marshal is not, while a policeman is, under the orders of the Superintendent of Police. A policeman, except those in detective* service—a long recognized branch of police service, for detectives *make arrests*—customarily wears a uniform when on duty; a fire mar-

---

* A public detective has been judicially defined as "one of a body of police officers usually dressed in plain clothes, to whom are entrusted the detection of crimes and the apprehension of the offenders": *Grand Rapids & I. Ry. Co. v. King,* 41 Ind. App. 701, 83 N. E. 778.

shal does not. Philadelphia has a police pension fund "maintained by an equal and proportionate monthly charge against each member of the police force." There was no such "monthly charge" against the appellee.

By the Charter Act of June 25, 1919, (53 P.S., secs. 3343, 3344 and 3345) "officers, clerks and employees are forbidden to demand, solicit, collect or receive . . . any assessment, subscription or contribution . . . for any political purpose." *Still greater restrictions* are imposed on policemen or firemen. They dare not *make* any contribution for any political purpose. An employee violating the command that he shall not solicit any subscription for a political purpose is subject to a fine not exceeding $500 and forfeiture of office. But a policeman or fireman disobeying the law enjoining his political activities, is subject to a fine of not less than $50 or more than $3,000, or he may be punished by imprisonment and any taxpayer may file a bill in equity to have such policeman's or fireman's further employment declared illegal and to prevent his further compensation. All these provisions as to political activities, as to the pension fund and as to uniforms, tend to prove that policemen and firemen are in *a class apart*. The importance of their distinctive services in maintaining peace and order in the city has often received statutory and judicial recognition. As they have to conform to higher standards of personal heroism and non-partisan conduct than others in the city's service, as the performance of their duties involves hazards to life and limb not encountered by other public servants, and as they (like soldiers) are obliged to maintain the highest possible personal standards of physical perfection and stamina, it is just that they are accorded the compensation of official security.

Our attention is called to evidence on the record showing that appellee "caught Joseph Rocco red-handed in the act of setting fire to a property at Fifth and Washington Avenue," and that appellee "used firearms in connection with the arrest of Morris Rosenberg, a firebug" and that "in the course of his duties appellee fre-

quently made arrests and personally took into custody the individuals arrested." In appellee's behalf, it is set forth that "13 arrests were made in connection with the Rosenberg arson ring by the appellee under the fire-marshal's direction and with his co-operation." Appellant attempts to declass these activities by stating that "in most of these cases it appears either that the defendants were properly brought, under the Act of 1911, to the office of the fire marshal for questioning and were then escorted by the petitioner from the fire marshal's office directly to the police department so that they might be arrested, or the defendants were already under arrest in various police stations, and were interviewed by the petitioner who then placed additional charges against them." However, accepting appellee's record of service exactly as he presents it, these episodes prove him to be a zealous assistant fire marshal but they do not invest him with the status of either a policeman or a fireman. Any mayor or district attorney or magistrate or any vigilant citizen might show equal courage and zeal in "catching fire-bugs red-handed" and accelerating their progress toward the penitentiary, without, ipso facto, attaining the legal status of policeman or fireman. An official status is not begotten merely by a mating of personal ambition with commendable activity. It is a public endowment, not a personal achievement. An official status is conferred by the sovereign power acting through its duly authorized agencies. So far as this State has spoken through the legislature, an assistant fire marshal is not a policeman or fireman, and neither reason nor authority would warrant the judiciary in construing as such the words "fire marshal" or "assistant fire marshal."

In the case of *Smith v. Philadelphia,* 305 Pa. 503, 158 A. 150, this court held that a "police surgeon" of the City of Philadelphia was not a police officer within the meaning of the Charter Act, though he did have authority to wear a uniform, possess fire and police box keys, wear a badge, and carry firearms. There we said that a police

surgeon did not have the duty which policemen had, to wit, "to enforce the municipal peace, i. e., the laws and ordinances for preserving the peace and good order of the community (31 Cyc. 902) ; his orders were, so far as the record discloses, those of a generally known police surgeon, not a police officer." In commenting on that case, appellee's able counsel says: "Obviously a police surgeon cannot be said to be contributing in any degree to the safety of the public or the enforcement of the municipal peace. An assistant fire marshal, however, whose duty it is to investigate incendiary fires and track down desperate criminals who are members of arson rings, is in the highest degree engaged in protecting the life, property and peace of the community." These propositions we cannot wholly accept. A police surgeon does by faithful performance of duty *contribute* to the safety of the public and the enforcement of the municipal peace; if he did not he would not have any reason for being a *police* surgeon. Every faithful official in the army of law and order makes some contribution to public safety and municipal peace, yet he does not thereby attain the rank of policeman. A fire marshal's statutory duty "to investigate the cause of destructive fires" and "to cause the arrest" of persons he believes guilty of arson and cognate crimes, falls short of the stern duty of *"tracking down desperate criminals,"* as that phrase is commonly understood. For example, a district attorney and his assistants investigate crimes and often "cause arrests to be made," but they are not policemen; neither is the appellee. Nor is he a fireman. The latter *fights* fires, while marshals *investigate* them.

Fire marshals and their assistants render important public service. It may be plausibly argued that they should have the same statutory protection against summary dismissal as policemen and firemen have, but if a grant of this protection is to come from the Commonwealth, the legislature and not the courts must be the medium of its expression.

The judgment is reversed.