366 A.2d 911

COMMONWEALTH of Pennsylvania, Pennsyl-
vania HUMAN RELATIONS COM-
MISSION, Appellant,

v.

BEAVER FALLS CITY COUNCIL et al.,
Appellees.

Supreme Court of Pennsylvania.

Argued April 1, 1976.

Decided Nov. 24, 1976.

---

Sanford Kahn, Gen. Counsel, Elizabeth S. Shuster, Asst. Gen. Counsel, Pa. Human Relations Com'n, Harrisburg, for appellant.

R. Clifford Hood, Beaver Falls, Edward S. Young, New Brighton, for appellees.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

POMEROY, Justice.

To ameliorate the drain on the resources of its local police department caused by the growing demand for parking meter patrols, the City Council of Beaver Falls enacted an ordinance authorizing the employment of "two (2) women to assist the police department in the patrolling of parking meters and parking stalls." [1]  *Marie A. Morrell* and Lauretta C. McConahy were hired by the City as "meter maids" to fill the two positions created by the ordinance.  After the two women had been employed for periods of three years and five and one half years respectively, they filed a complaint before the Pennsylvania Human Relations Commission [2] [hereinafter "the Commission"] alleging that the Beaver Falls City Council, Mayor Nick L. Camp and Chief of Police Russell Chiodo, appellees herein, engaged in unlawful sex discrimination in violation of § 5(a) of  the Pennsylvania

---

1.  Ordinance No. 1211, City of Beaver Falls (enacted February 21, 1966).  The ordinance provides in relevant part:

> "Whereas, the extensive use of parking meters in the City of Beaver Falls, both on street and off-street, has caused a drain upon the resources of the police department and necessitated the diverting of a number of police officers from their regular duties,
>
> "NOW THEREFORE, BE IT ORDAINED AND ENACTED by the Council of the City of Beaver Falls and it is hereby ordained and enacted by virtue of the authority of the same, as follows:
>
> "Section 1.  The Mayor, with the approval of Council, is hereby authorized to employ two (2) women to assist the police department in the patrolling of parking meters and parking stalls whether the same are installed on city streets or on any parking lot operated by the Parking Authority."

On October 12, 1971 a second ordinance was enacted.  This ordinance created two additional meter maid positions, but halved the time that each meter maid could work.  Ordinance 1305, City of Beaver Falls.

2.  The complaint was filed on September 21, 1971.

Human Relations Act.[3] The complaint alleged in pertinent part:

" . . . that the respondents discriminated against them and all other women as a class in the terms, conditions and privileges of employment as police officers because of their sex (female) by (a) restricting their job opportunities solely to the position of meter maid, (b) compensating them at a lower pay rate than male employes assigned to similar job duties, (c) refusing to grant them pay increases similar to that furnished male police officers in line with past practices, and (d) by changing the status of their job assignment from that of full-time employes to part-time employes causing the complainants a loss in wages and denial of vacation, sick and health insurance and all other benefits of employment furnished full-time employes of the respondent."

In support of their complaint the complainants established at a hearing that despite the fact that they performed functions previously undertaken by police officers, they were not given raises which were awarded to policemen, they were obliged to work longer hours for less pay, they had a less advantageous vacation schedule than did policemen and they enjoyed no civil service or collective bargaining protection.

After a hearing the Commission made the following conclusion of law:

" . . . that Respondents [appellees] did discriminate on the basis of sex, with respect to the Complainants' compensation, terms, conditions and privileges of employment, including salary increases, hours of work, overtime pay and vacation leave, by treating Complainants as *de facto* members of the Beaver Falls Po-

---

3. Act of October 27, 1955, P.L. 744, Section 5(a), as amended, 43 P.S. § 955(a) (Supp. 1974–1975). For convenience the Pennsylvania Human Relations Act will be referred to as "PHRA" and Section 5(a) of the Act will be referred to as Section 5(a).

lice Department while failing to create positions on the Police Department with duties and responsibilities similar to those performed by Complainants and providing Complainants with an opportunity to secure said positions; and by purposefully restricting the hiring and advertising for the positions held by Complainants to females only."

To remedy these discriminatory practices the Commission ordered the City of Beaver Falls, *inter alia,* to create within the police department of the City two meter patrol officer positions to correspond to the positions created under the ordinance; to hire complainants to fill these positions; to bestow full civil service status on complainants without regard to governing statutory requirements;[4] and to make various salary adjustments in complainants' pay. In addition the Commission declared null and void the ordinance which created the meter maid positions.

On appeal the Commonwealth Court set aside the order of the Commission. In that court's view, the gravamen of the complaint was that meter maids, because of their sex, were denied the same employment benefits enjoyed by police officers. Accordingly, the court reasoned, the propriety of the Commission's order turned on whether the complainants were in fact serving in the capacity of police officers and thus deserving of equal treatment. The court concluded that complainants do not perform those functions commonly associated with the responsibilities of a police officer. It held, accordingly, that the complaint was without merit. In addi-

4. The Third Class City Code requires all police officers to take and pass a civil service examination. See Act of June 23, 1931, P.L. 932, art. XLIV, as amended, 53 P.S. § 39401. The Commission's order would in effect waive this requirement. Because we conclude that the complainants are not entitled to any remedial relief whatsoever we need not decide whether the Commission has the authority to suspend the applicability of a duly enacted statute.

tion, the court held that the Commission could not, in the instant proceeding, declare the meter maid ordinance to be null and void because the complainants, as beneficiaries of the ordinance, lacked standing to contest its legality. We granted allocatur and now affirm the order of the Commonwealth Court.

The complaint before the Commission alleged that appellees discriminated against complainants "in the terms, conditions and privileges of employment *as police officers* because of their sex." The fair import of this language is that the complainants believed that the meter maid position entails functions, formerly performed by the police, which should still be considered police work; these functions, it is argued, were severed from the police department and assigned to women in order to allow the city to hire females to do police work without having to grant them corresponding benefits. The central premise upon which the complaint rests is that the meter maids are, in truth, police officers. If this premise has not been established then it follows that complainants have demonstrated no entitlement to a police officer's employment benefits; the mere fact that a newly established non-police position has been assigned exclusively to females would not be an adequate ground to bestow upon those female employees the attributes of employment which are enjoyed by police officers.

As Judge Rogers put it in his opinion for a unanimous Commonwealth Court, "the title of policeman [may] be properly applied to one who performs services critical to public safety in the investigation and detection of serious crimes—a person trained, equipped (with . . . gun, handcuffs, badge of office and motor vehicles) and actually engaged in the detection of persons suspected of crime." *Beaver Falls City Council et al., v. Commonwealth of Pennsylvania, Pennsylvania Human Relations Commission,* 17 Pa.Cmwlth. 31, 330 A.2d 581,

583 (1975). This definition is in accord with prior opinions which have addressed the issue. *McNitt v. Philadelphia*, 325 Pa. 73, 189 A. 300 (1937); *Venneri v. County of Allegheny*, 5 Pa.Cmwlth. 105, 289 A.2d 523 (1974); *County of Allegheny v. Hartshorn*, 9 Pa.Cmwlth. 132, 304 A.2d 716 (1973), *aff'd* 460 Pa. 560, 333 A.2d 914 (1975). The primary responsibility of the meter patrol officer, in contrast, is to ticket those automobiles which are found to be parked overtime at parking meters. Although they are sometimes asked to look out for stolen vehicles and have, on occasion, assisted in the transportation of female prisoners, meter maids are in no way trained or equipped to engage in the investigation of persons suspected of committing serious offenses. The fact that meter maids do enforce the city's parking ordinances does not convert them to police officers. In *McNitt v. Philadelphia, supra,* we considered whether a fire marshall who was responsible for the investigation of possible arson offenses may, for that reason, be said to be a police officer. We observed that "fire marshalls, mine inspectors, factory inspectors, boiler inspectors, and milk inspectors are all charged with law enforcement duties, but they help enforce laws affecting only *special* subjects, while a policeman's duty is the enforcement of *all laws* whose violation affects the peace and good order of the Community." *Id.*, 325 Pa. at 76, 189 A. at 301. On this basis we concluded in *McNitt* that fire marshalls are not policemen. For like reason, meter maids cannot be considered police officers simply because they are engaged in the enforcement of a limited, specialized type of traffic regulation.

The Commission, however, urges that the complaint was not bottomed on the contention that the complainants were police officers; it concedes that "Beaver Falls could have created the lower-status meter patrol officer position to perform duties previously performed by patrolmen if the new positions were in fact, as well as on

their face, sex neutral." (Appellant's brief at 12). The Commission contends that the Commonwealth Court misperceived the problem and it urges that we direct our attention to the discriminatory nature of the meter maid ordinance. The Commission argues that the ordinance as written impliedly limits employment opportunities for women on the Beaver Falls police department and was designed to preclude women from employment on the all male force. In essence the Commission portrays the ordinance as an extension of preexisting discriminatory hiring policies of the police department.

The simple answer to the Commission's assertion is that the complainants have not alleged that they were denied employment on the Beaver Falls police force. Indeed, neither Morrell nor McConahy ever applied for employment as a police officer nor did they seek by their complaint to be installed in such a position. Rather they seek to elevate their *current* jobs to the status of police officer and thereby attain the attendant benefits. For the reasons stated above, the complainants are not entitled to such relief.

The Commission contends finally, that, by *requiring* the employment of women, Ordinance 1211, see n. 1, *supra,* violates the anti-discrimination provisions of § 5(a). Although the impact of that ordinance on female employment opportunities is facially beneficial, the Commission asserts that the enactment serves to discriminate against women. It attempts to analogize the ordinance to those protective statutes which have been enacted to insulate women from physically demanding jobs,[5] unwholesome employment atmospheres [6] or like requirements or conditions of employment which legislators have misguidedly perceived as having a deleterious effect

5. *Bowe v. Colgate-Palmolive Co.,* 416 F.2d 711 (7th Cir. 1969) (restrictions on the weight which women were allowed to lift.)

6. *Sail'er Inn v. Kirby,* 5 Cal.3d 1, 95 Cal.Rptr. 329, 485 P.2d 529 (1971). (Prohibition on women tending bar.)

on women. While the Commission quite correctly points out that women have successfully attacked such statutes under the applicable fair employment laws, its argument overlooks the vital distinction between protective statutes and the ordinance here in question.

██ Protective statutes impose legal limitations on the type of work which a woman may be allowed to do, regardless of individual qualifications or capabilities. These restrictions are based on stereotypic assumptions about female workers as a class and as a result may be attacked by members of that class. The Beaver Falls ordinance, however, in no way serves to restrict the employment opportunities of the female worker. It does not preclude a woman from applying to the police department for employment as a police officer and it does not restrict the scope of responsibilities which a woman could assume were she hired for that position. The arguable taint of the ordinance lies in its expressed exclusion of males. There was, however, no male complainant before the Commission who sought redress of this wrong. Thus the Commonwealth Court correctly concluded that the viability of the ordinance under § 5(a) of the PHRA was not properly in issue.[7]

In concluding, we emphasize that the instant case is not one in which the police department is alleged to have discriminated on the basis of sex by refusing to hire women as police officers. Rather, we have here an attempt by a city to economize by severing from the police department certain functions once within the scope of its operations by the creation of a new job category which

7. Moreover, even assuming that the issue could have been raised by the present complainants it would not support the remedial relief which the complainants were awarded. The vice of the ordinance would be best remedied by directing that men be permitted to apply for the position of meter patrol officer; it would not be cured by an order such as was here entered to elevate the position to that of police officer and then to appoint the instant complainants to the positions.

has been made available to women only. Whether or not a city may legally so restrict the new position, it is under no duty to compensate whomever it hires as though the appointees were police officers.

Order affirmed.

ROBERTS, J., filed a dissenting opinion in which NIX, J., joins.

MANDERINO, J., filed a dissenting opinion.

ROBERTS, Justice (dissenting).

The majority determines that the central premise of the complaint is that meter maids are discriminated against on the basis of sex because they are police officers who are not accorded the same salary and benefits as male police officers. The majority decides as a matter of law that meter maids are not police officers and concludes that the complaint is without merit. This analysis skirts the Commission's case; by its technical reading of the complaint, the majority fails to come to grips with the issue presented. I dissent.

The Commission does not simply assert that meter maids are police officers.[1] The City Council of Beaver Falls created a new job category restricted to women to perform work previously performed by the all-male police force. The Commission argues that from its inception the job of meter maid was undervalued because it was seen as a woman's job. The Commission contends that the city economized at the expense of complainants because it perceived women as more amenable to low paying dead-end jobs. In short, the Commission asserts that the terms, conditions and privileges of complainants'

1. As long as minimal notice requirements are met, it is not the theory of the complaint, but the theory adopted by the Commission which this Court is called upon to review. See e. g., *Macklin v. Spector Freight Systems, Inc.*, 156 U.S.App.D.C. 69, 478 F. 2d 979 (1973).

employment were undervalued because of stereotyped notions about women.

The Commission concludes that meter maids did not receive certain vacation benefits, salary increases, overtime pay and working hours because they were women. If the job had been open to both men and women, meter maids would have received better terms, conditions and privileges of employment. In reaching its conclusion, the Commission compared the terms, conditions and privileges of employment of meter maids and police officers. The Commission found that although there were some differences in their duties and responsibilities, there were sufficient similarities to justify the comparison.[2]

## I.

On September 21, 1971, Ms. Marie A. Morrell and Ms. Lauretta C. McConahy, Beaver Falls meter maids, filed a complaint with the Pennsylvania Human Relations Commission alleging that the city of Beaver Falls was discriminating against them and all other women as a class in the terms, conditions and privileges of employment as police officers by:

"(a) restricting their job opportunities solely to the position of meter maid, (b) compensating them at a lower pay rate than male employes assigned to similar duties, (c) refusing to grant them pay increases similar to that furnished male police officers in line with past practices, and (d) by changing the status of their job assignment from that of full-time employes to part-time employes causing the complainants a loss of wages and denial of vacation, sick and health insur-

2. Meter maids perform work which had previously been performed by the all-male police force. In light of the fact that the police department had never hired a woman, the city's attempt to economize by isolating some police functions and assigning them to a new low status position created solely for women, made the comparison between meter maids and police officers particularly relevant.

ance and all other benefits furnished full-time employees of the respondents."

Efforts to negotiate a settlement failed, and the Commission held hearings. The Commission's findings are as follows. In 1966, the city council adopted an ordinance which authorized the hiring of two women as meter maids. Meter maids work under the authority of the police department. Although meter maids are not by law members of the police force, the Commission found that they are "de facto" members of the police department. Meter maids' duties have essentially consisted of patrolling parking meters and writing tickets for parking violations. However, meter maids have occasionally performed other police duties, including searching of female prisoners, aiding in the escort of female prisoners to prison or female patients to hospitals, directing traffic, observing for stolen cars, and apprehending runaway children. Although complainants do not generally perform the same duties or responsibilities as police officers, the Commission determined that male patrolmen sometimes perform the same tasks as meter maids.

The Commission found that there had never been a female in the police department, and that responsible city officials, including appellees, believed that the work was too arduous and difficult for women. Police officers on the all-male police force received substantially higher salaries than meter maids, received pay increases not received by meter maids, and were protected by civil service status and entitled to collective bargaining while meter maids were not.[3]

The Commission concluded as a finding of fact that Beaver Falls discriminated against complainants on the basis of sex with respect to the terms, conditions and

3. The Commission also found that a new city ordinance would double the number of meter maids, but half the length of their work week, and that there was no administrative justification for this adjustment.

privileges of employment, in violation of sections 5(a) and (b) of the Pennsylvania Human Relations Act [4] and framed an order designed to remedy the violation.[5] On appeal, the Commonwealth Court vacated the Commission's order, a decision which the majority affirms.

## II.

The majority relies on the language of the complaint in concluding that the Commission's case is without merit. The complaint alleges that "respondents discriminated against [the complainants] and all other women as a class in the terms, conditions and privileges of employment as police officers." Based on this language, the majority asserts that the central premise of the Commission's case is that meter maids are police officers and should be treated as such.

4. Act of October 27, 1955, P.L. 744, sections 5(a) and 5(b), as amended, 43 P.S. §§ 955(a) and (b) (Supp.1975) (hereinafter referred to as the "PHRA").

5. The Commission ordered the city to create two positions on the police force for "meter patrol officers" with duties identical to those of meter maids and to hire complainants to fill these positions. These officers were to be given "full civil service status." Meter patrol officers were to be entitled to the same working hours as police officers and were to receive overtime pay and vacation leave on the same basis as others on the force. The order further provides that the salary paid the new meter patrol officers be increased by the same percentage that the salary of the lowest paid patrolman on the force had increased between 1966 and the date of the order. Back pay with interest was also awarded. Finally, the Commission ordered that in the future the position of meter patrol person was to be open to all persons regardless of sex and that the city cease and desist advertising the position as limited to women.

It should be noted that the Commission did not require equal pay for policemen and meter maids. The Commission found that meter maids do not perform the same duties or have the same responsibilities as patrolmen or other members of the police department and that the city did not discriminate in paying meter maids a lower salary. However, the Commission found that the distinction between meter maids and police officers in salary increases, working hours, overtime pay and vacation benefits were not justified by the difference in the jobs. The Commission found that these distinctions constituted discrimination on the basis of sex.

The majority's reliance on the language of the complaint to evaluate the Commission's theory of discrimination is unsound. This complaint was filed before the Pennsylvania Human Relations Commission, which as an administrative agency is not subject to the same technicalities required in pleadings filed in judicial proceedings. See K. Davis, Administrative Law Treatise §§ 8.-04–8.05 (1958). Although the complaint does state that the complainants were discriminated against as "police officers," this is not the theory of discrimination which the Commission presents.

In *Pittsburgh Press Employment Advertising Discrimination Appeal*, 4 Pa.Cmwlth. 448, 458–59, 287 A.2d 161, 167 (1972), aff'd, 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973), the Commonwealth Court held that a complaint filed before the Pennsylvania Human Relations Commission satisfied the notice requirements of due process even though it lacked allegations of specific acts of discrimination. The court noted:

"This is an administrative proceeding and is not restricted by the niceties of common law pleadings. The Pennsylvania Legislature in its wisdom permitted the establishment of local administrative agencies to process complaints and hold proceedings to adjudicate issues concerning certain rights of citizens. It certainly was within the contemplation of the Legislature that such a local administrative agency would be lay-oriented. It was contemplated, and is indeed the reality, that persons not formally trained in the law often serve as human relations commissioners. Similarly, it was to be expected that the complaints and charges would be framed in the language of laymen. Administrative agency proceedings have never been held to the high standards of the law suit filed in a court of law. In *Kochinsky v. Independent Pier Company*, at 157 Pa.Super. 15 [18], 41 A.2d 409, 410–411 (1945), the court said: 'Proceedings before the compensation au-

thorities are not "litigation", and the strict rules of pleading and practice applicable to common law actions do not apply. The courts take a liberal attitude toward the pleadings in compensation cases and consider the substance of the relief prayed for rather than its form. . . . Of course, the parties are entitled to know the issue in any particular proceedings, so that they may be prepared to meet it by proper evidence.' "

Complaints filed before federal agencies are likewise given liberal interpretation. In *Golden Grain Macaroni Co. v. F. T. C.*, 472 F.2d 882 (9th Cir. 1972), cert. denied, 412 U.S. 918, 93 S.Ct. 2730, 37 L.Ed.2d 144 (1973), a complaint was filed before the F.T.C. alleging that Golden Grain had violated section 2 of the Sherman Act. The hearing examiner determined that there was insufficient evidence to sustain a violation of the Sherman Act, but found that Golden Grain had violated section 7 of the Clayton Act. Golden Grain appealed the F.T.C.'s order, contending that it was a violation of due process to find a violation of a statute which was not mentioned in the complaint. The Court of Appeals for the Ninth Circuit affirmed the F.T.C., stating:

"Under the Administrative Procedure Act § 5(b), 5 U.S.C. § 544(b), persons entitled to notice of an administration hearing must be informed of 'the matters of fact and law asserted.' However, the purpose of the Act is satisfied, and there is no due-process violation, if the party proceeded against 'understood the issue' and 'was afforded full opportunity' to justify its conduct."

472 F.2d at 885 (citations omitted).

Like the complaint in *Golden Grain*, the complaint here is "hardly a model of clarity." Id. at 886. As long as the parties have sufficient notice, the complaint is adequate. That the complaint did not reflect the subtlety of

the Commission's theory should not determine the merits of the case.

In *Macklin v. Spector Freight Systems, Inc.*, supra, the court, in construing the allegations of a complaint filed before the Equal Employment Opportunity Commission, stated:

"[T]he matters the Commission proceeds to investigate should assist in determining the scope of the complaint . . . .

"It should be remembered that the . . . requirements we are applying here are not aimed at polished lawyer's pleadings, but rather at charges brought, initially, by laymen usually unassisted by attorneys. . . . Thus, it makes sense, in our view, . . . to read [the charges] with considerably more latitude and with weight to the construction given them by the Commission in the matters it proceeds to investigate. . . ."

Id. at 988 (citations omitted).

This Court should review the theory which the Commission articulates, instead of evaluating the case based on a technical reading of the complaint.

The majority's reliance on "the niceties of common law pleadings" in reading the complaint leads it to the conclusion that the issue in this case is whether meter maids are police officers. It adopts the definition of police officers articulated by the Commonwealth Court and decides as a matter of law that they are not. The Commonwealth Court held that:

"the title policeman [may] be properly applied to one who performs services critical to public safety in the investigation and detection of serious crime—a person trained, equipped (with . . . gun, handcuffs, badge of office and motor vehicles) and actually engaged in the detection of persons suspected of crime."

*Beaver Falls City Council et al. v. Commonwealth of Pennsylvania, Pennsylvania Human Relations Commission,* 17 Pa.Cmwlth. 31, 33, 330 A.2d 581, 583 (1975).

This definition was derived from cases which defined a "police officer" within the meaning of particular statutes. The majority relies on *McNitt v. Philadelphia*,[6] which addressed the issue of whether a fire marshal was a "police officer" within the meaning of section 18 of the Charter Act.[7] The majority also refers to *Venneri v. County of Allegheny*,[8] and *County of Allegheny v. Hartshown*,[9] both of which defined "police officer" within the meaning of Act 111 [10] which provides for procedures for police officers to bargain with their employer. As the Commission's theory is not predicated on the determination that meter maids are police officers, the majority's conclusion that they are not is not determinative of this case.

In order to determine whether meter maids were discriminated against, the Commission compared meter maids with police officers. This comparison provided a legitimate method for determining whether meter maids were discriminated against.[11] The cases upon which the majority relies do not prohibit this comparison.

### III.

In determining whether the Commission has articulated a cognizable claim of sex discrimination under the

6. 325 Pa. 73, 189 A. 300 (1932).
7. Law of June 25, 1919, art. XIX, section 18 (1919), P.L. 581, as amended, 53 P.S. § 12638 (1957).
8. 5 Pa.Cmwlth. 105, 289 A.2d 523 (1974).
9. 9 Pa.Cmwlth. 132, 304 A.2d 716 (1973). aff'd, 460 Pa. 560, 333 A.2d 914 (1975).
10. Act of June 24, 1968, P.L. 237, No. 111, § 7, 43 P.S. § 217.1 (Supp.1976).
11. The comparison need not be limited to police officers where the complaint alleges that a position is undervalued, rather than alleging unequal treatment within the same job category, any comparison made necessarily involves a comparison with similar but not identical jobs.

PHRA, this Court should be guided by the directive of the Legislature in the Act itself:

"The provisions of this act shall be construed liberally for the accomplishment of the purposes thereof . . . ."

Act of October 25, 1955, P.L. 744, as amended, 43 P.S. § 962 (1964). These purposes are legislatively declared in the Act as follows:

"It is hereby declared to be the public policy of this Commonwealth to foster the employment of all individuals in accordance with their fullest capacities regardless of their . . . sex . . . and to safeguard their right to obtain and hold employment without such discrimination, to assure equal opportunities to all individuals . . . ."

Act of October 25, 1955, P.L. 744, as amended, 43 P.S. § 952(b) (Supp.1975).

The Commission's contentions should be evaluated with this legislative purpose in mind. The Commission argued that the position of meter maid was created as a low paying dead-end job because the City Council of Beaver Falls perceived them as more amenable to less favorable working conditions than men.

It is well substantiated that women are often paid less than men because of stereotyped notions which our fair employment law seeks to eradicate.

"As a group . . . when compared with men, women fare far worse at every stage in the employment process. Women workers . . . earn less, and hold proportionately fewer of the more prestigious and remunerative professional . . . positions then their male counterparts despite substantially equal educational attainments.

"Women in general suffer from widely held notions —sometimes enacted into law—that they are intrinsically inferior to men for purposes of employment.

Most common among these stereotypes of women are that they are emotionally incapable of leadership positions; are too weak to perform heavy physical labor; and are too delicate for hazardous occupations. When compared to men, women are assumed to have . . . less need for the financial benefits of a job." Developments in the Law, Title VII, 84 Harv.L.Rev. 1109, 1167–68 (1971).

If the city council attempted to economize at the expense of women, because of stereotyped notions of the worth of women's work, then the Commission has articulated a cognizable claim under the PHRA.

In *General Electric Corp. v. Commonwealth of Pennsylvania, Pennsylvania Human Relations Commission,* 469 Pa. 292, 365 A.2d 649 (1976) (Opinion of Pomeroy, J., joined by Eagen and O'Brien, JJ.), Mr. Justice Pomeroy stated:

"Employment decisions must not, of course, be allowed to be made on the basis of a person's sex, and decisions so based must not be permitted to be justified by perfunctory resort to claims of economic efficiency. . . ."

Id. at 303, 365 A.2d at 655.

"Employment decisions which are based on stereotypic assumptions have been universally condemned . . . ."

Id. at 315, 365 A.2d at 661 n. 25.

## IV.

The Commission has articulated a cognizable claim of sex discrimination, but its findings are incomplete. Although a complaint filed before the Commission need not conform to the technical requirements of common law pleadings, the Commission must provide all findings of fact which are essential to the resolution of the issues before it. Otherwise, the reviewing court cannot deter-

mine the propriety of the agencies' actions. *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1952) and cases cited therein; *Page's Department Store v. Velardi,* 464 Pa. 276, 346 A. 2d 556 (1975) and cases cited therein. See generally K. Davis, Administrative Law Treatise § 16–05 (1958, Supp.1976).

In *Page's Department Store v. Velardi,* supra, this Court held that "when the fact finder . . . is required to set forth his findings in an adjudication, that adjudication must include all findings necessary to resolve the issues raised by the evidence and which are relevant to a decision." Id. at 561. Moreover, the reviewing court should not

"infer from the absence of a finding on a given point that the question was resolved in favor of the party who prevailed below, for the point may have been overlooked or the law misunderstood at the trial or hearing level. In cases such as the one before us in which essential findings of fact were not made the case must be remanded so that the findings may be supplied."

Id. (citations omitted).

In order to sustain its position, the Commission would have had to establish that meter maids did not receive certain vacation benefits, overtime pay, salary increases and working hours because they were women. The comparison between police officers and meter maids is probative on this issue because police officers afford the closest comparison. Additionally, it must be established that the position of meter maid was undervalued because of stereotyped notions about women. The Commission's findings do not address this issue with sufficient specificity and therefore, a remand is required.

## V.

The Commission also contends that the creation of the position of meter maid for women only, in the context of

a police department which had never hired a woman, impliedly restricted women to the lower status position of meter maid. The majority argues that the Commission cannot attack the meter maid ordinance as an extension of pre-existing discriminatory hiring policies of the police department because complainants did not allege that they had applied to be police officers. However, if the complainants reasonably believed that it was futile for them to apply for the position because of the police department's discriminatory failure to hire women, then complainants do have standing to challenge the practices without actually having applied for the position of police officer. *Macklin v. Spector Freight Systems, Inc.*, 156 U.S.App.D.C. 69, 478 F.2d 979 (1973); *Carter v. Gallagher*, 452 F.2d 315 (8th Cir. 1972).

In *Boudreaux v. Baton Rouge Marine Contracting Company*, 437 F.2d 1011, 1016 n.9 (5th Cir. 1971), the court determined that a longshoreman had standing to bring suit under Title VII, even though he did not report to shape-ups, the procedure for obtaining employment. The court found the following analogy to be persuasive:

"If the defendant employers had posted a sign reading 'No Negroes will be hired for light work,' it is inconceivable that [the complainant] would be held to have been obliged to go through the futile gesture of attending the shape-up in order to establish his status as a person aggrieved. [The result should not] be different merely because the employers' practice, although equally notorious, was less openly publicized."

The Commission made no findings on this issue. Since I believe a remand is necessary to ascertain whether the position of meter maid is undervalued, I would also remand to the Commission to determine whether complainants reasonably believed that it was futile to apply to become police officers, thereby allowing them to challenge the ordinance as an extension of pre-existing discriminatory policies.

## VI.

Because of its technical reading of the complaint, the majority overlooks the Commission's theory of the case. Since I believe that the Commission has articulated a meritorious claim under sections 5(a) and (b) of the PHRA, I would vacate the Commonwealth Court order and remand to the Commission.

NIX, J., joins in this dissenting opinion.

MANDERINO, Justice (dissenting).

I dissent. In the past this Court has been willing to adopt a two-part test in construing Section 5(a) of the Pennsylvania Human Relations Act, Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. § 955(a) (Supp. 1974–1975). Specifically, we have looked for not only evidence of *overt discriminatory practices*, but also evidence of *facially neutral employment practices which* have the effect of *perpetuating prior discriminating practices*. As this Court stated in *General Electric Corp. v. Com. of Pennsylvania*, 469 Pa. 292, 365 A.2d 649 (filed October 20, 1976):

"Section 5(a) was enacted in part to put an end to those invidious, discriminatory policies and practices which have in the past served to deprive women of equal employment opportunities. To this end the section outlaws such policies and stands as a guarantee that a woman's qualifications for the position she seeks will be evaluated with neutral objectivity. This statutory imposition of neutral employment requirements does not in itself, however, assure equal opportunities to the victims of past discriminatory practices; such persons still remain shackled by the already suffered deprivations of seniority rights, access to training programs, promotions and the like. Occasionally, a facially neutral employment policy incorporates as a criterion for employment a qualification which a fe-

male has been precluded from attaining by virtue of an abandoned discriminatory policy. *In such an instance the impact of the past discriminatory practices is perpetuated and the former victim is deprived of equal employment opportunity just as surely as if she were the current object of an overt discriminatory practice."* (Emphasis added.)

The majority opinion disregards the above standards and falls into the "trap" set by Beaver Falls, when it concludes that since neither Morrell nor McConahy ever applied for employment as a police officer they have no right to complain about any extension of pre-existing discriminatory hiring policies of the police department. If the City Council of Beaver Falls intended to perpetuate a policy of an all-male police force by creating a "special" meter maid position for "women only," they have effectively done it in this case. The majority opinion advises the council that if its new "position" is good enough to attract women and to keep them in their place, then so long as the women do not apply for jobs on the police force, the system is protected. In other words, if the discriminatory practices are effective (in preventing women from applying for jobs as police officers) this Court will condone the practice.

It is most unfortunate that the majority refuses to consider whether the practices adopted by Beaver Falls had the effect of "chilling" the rights of female employees to apply for jobs as police officers. It seems to me that if a woman needed and wanted work in Beaver Falls, it would be advantageous for her to follow the "hint" of the Beaver Falls Council in applying for the "female only" jobs, rather than making waves in applying for a job on the police force.

Accordingly, I would vacate the order of the Commonwealth Court and reinstate the order of the Pennsylvania Human Relations Commission.