Vittorio MINEO, on behalf of himself
and all others similarly situated

v.

PORT AUTHORITY OF NEW YORK
AND NEW JERSEY, Appellant.

No. 83–5588.

United States Court of Appeals,
Third Circuit.

Argued May 16, 1985.

Decided Dec. 27, 1985.

Rehearing and Rehearing En Banc
Denied Feb. 6, 1986.

Hugh H. Welsh (Argued), Arthur P. Berg, Anne M. Tannenbaum, Jersey City, N.J., for appellant.

Seymour Margulies, Jack Jay Wind, (Argued), Margulies, Margulies and Wind, Jersey City, N.J., for appellees.

Before ADAMS, BECKER and VAN DUSEN, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Senior Circuit Judge.

This case, before the court on the district court's certification pursuant to 28 U.S.C. § 1292(b) (1982), presents the question whether appellees (hereinafter "Detectives"), who are police detectives employed by appellant, The Port Authority of New York and New Jersey (hereinafter "Port Authority"), are covered by the wage and hour provisions of the Fair Labor Standards Act, 29 U.S.C. §§ 201–19 (1982) (hereinafter "FLSA"). In *Garcia v. San Antonio Metropolitan Transit Authority,* —— U.S. ——, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), which was decided after this court granted the Port Authority's petition for leave to appeal, the Supreme Court overruled its earlier decision in *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), and held that all state and municipal employees are covered by FLSA. For the reasons set forth in this opinion, we hold that *Garcia* should not be accorded retroactive application on the facts presented by this case and therefore that the Detectives do not fall within the coverage of FLSA. We will reverse the district court's denial of the Port Authority's motion to dismiss and will remand the case to the district court accordingly, with directions to dismiss this civil action.

### I.

The Detectives are persons employed by the Port Authority as police detectives assigned to the Authority's Investigating Unit. They are authorized by the laws of New York and New Jersey to act as police officers, N.Y.Crim.Proc.L. § 1.20, subdivision 34(k) (McKinney 1981); N.J.Stat.Ann. § 32.2–25 (West 1963), and have the same powers as police directly employed by the two states. *See State v. Cohen,* 73 N.J. 331, 337, 375 A.2d 259, 264 (1977).[1] The Port Authority is a municipal instrumentality of New York and New Jersey created by a compact between these two states with the consent of Congress (hereinafter "Compact"). *See* 1921 N.Y.Laws Ch. 154; 1921 N.J.Laws Ch. 151, pp. 412–22; S.J. Res. 88, 42 Stat. 174 (1921).[2]

---

1. According to the Port Authority's job specification 2601, it is the duty of the Detectives to perform confidential investigations "for the purpose of maintaining internal security at Port Authority facilities and preventing unlawful conduct." Job specification 2601 identifies the major duties of the Detectives to include: establishing factual evidence of conduct in violation of federal, state, and municipal laws, as well as Port Authority regulations; maintaining surveillance to prevent criminal activity at Port Authority facilities; investigating complaints against fellow members of the Port Authority police; conducting character investigations of Port Authority employees; and gathering evidence concerning vehicular accidents and aircraft emergencies involving Port Authority facilities (App. at 33a–34a).

2. The Port Authority is authorized and directed to plan, develop, and operate facilities of commerce that promote the economy of the Port

This case had its origins in a collective bargaining dispute between the Detectives and the Port Authority over the latter's alleged refusal to pay the Detectives one and one-half times their regular hourly rate for hours worked in excess of forty hours a week. On October 10, 1980, in the midst of contract negotiations, the Detectives filed a complaint in the district court alleging that the refusal to pay this overtime rate violated Port Authority regulations. They later amended the complaint to allege that the Port Authority's refusal to pay overtime constituted a violation of FLSA.[3]

On December 2, 1980, the Detectives and the Port Authority signed a collective bargaining agreement that took retroactive effect as of July 9, 1978. This agreement provided that the Detectives would be paid time and one-half for hours worked on a regular day off or vacation day, but not if they simply worked more than a certain number of hours in a given week.[4] Under the agreement, the Detectives were paid 25% more an hour than regular police officers employed by the Port Authority. During the course of the contract negotiations between the two parties, the Port Authority had contended that this 25% premium wage was being paid to the Detectives because they were often required to work overtime for which they received no increased hourly wage. The Detectives asserted, however, that they were entitled to the 25% premium because they performed duties in addition to those performed by regular Port Authority police officers and that the 25% premium therefore did not represent payment in lieu of time and one-half for overtime. The contract settlement thus did not end the overtime dispute, and the agreement contained no provision for the termination of the present lawsuit.[5]

Following a period of limited discovery, the Port Authority moved to dismiss the complaint, contending that the Supreme Court's decision in *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), exempted state employees such as the Detectives from FLSA because they performed a "traditional governmental function." The Detectives responded by moving for partial summary judgment. The district court held a hearing on both motions. On September 29,

District, which comprises an area of approximately 1,500 square miles in both states, centering about New York harbor. Specifically, the Port Authority is authorized to purchase, construct, lease, and operate any terminal or transportation facility and, as an incident thereto, to own or lease real or personal property and to borrow money secured by such property. *See* N.Y.Unconsol.Laws § 6407 (McKinney 1979); N.J.Stat.Ann. § 32:1–7 (West 1963). Examples of some of the transportation facilities operated by the Port Authority or one of its subsidiaries include: the Goethals, Bayonne, and George Washington Bridges; the Holland and Lincoln Tunnels; the Newark, La Guardia, and JFK International Airports; the Hoboken, Elizabeth, and Red Hook Marine Terminals; the World Trade Center; the Bathgate Industrial Park; and the Port Authority Trans-Hudson (PATH) commuter railroad. *See* The Port Authority of New York and New Jersey 1981 Annual Report 1–4 (1982). *See generally* Frankfurter & Landis, *Compact Clause of the Constitution—A Study in Interstate Adjustments*, 34 Yale L.J. 685, 697–98, 746–47 (1925) (discussion of history of Port Authority).

3. FLSA provides that no employer shall employ any of its employees for a workweek longer than forty hours unless such employees receive compensation of at least one and one-half times the regular hourly rate for those hours worked in excess of forty hours. 29 U.S.C. § 207(a)(1). FLSA defines "employer" to include a public agency, 29 U.S.C. § 203(d). A "public agency" is defined to include "any agency of . . . a State, or a political subdivision of a State; or any interstate governmental agency." 29 U.S.C. § 203(x).

4. On April 3, 1984, the Port Authority and the Port Authority Detectives Endowment Association executed a new collective bargaining agreement which took effect retroactively as of July 3, 1983. Under the terms of this new agreement, the Detectives are paid time and one-half for overtime if they work more than a prescribed number of hours per week.

5. The Detectives subsequently moved to proceed under the class action procedures of Fed.R. Civ.P. 23. The district court granted their motion with respect to the claim that the Port Authority violated its own regulations, but ordered them to pursue their FLSA claim under the permissive joinder provisions of that statute, 29 U.S.C. § 216(b). In accordance with these provisions, twenty-five police detectives became plaintiffs by opting to join in the FLSA action against the Port Authority.

1982, the district court filed an opinion and order denying the Port Authority's motion to dismiss. The court based its ruling on this court's earlier decision in *Kramer v. New Castle Area Transit Authority*, 677 F.2d 308 (3d Cir.1982), *cert. denied*, 459 U.S. 1146, 103 S.Ct. 786, 74 L.Ed.2d 993 (1983), which held that a mass transit authority was not an integral operation in an area of a state's "traditional governmental functions" and, therefore, that its bus drivers were not exempted from coverage under FLSA. *Id.* at 310. Reasoning that the Port Authority is engaged in the business of mass transit, the district court concluded that its employees, including the Detectives, are not exempt from FLSA coverage under *National League of Cities.* [6]

Because the case revolved around a potentially dispositive legal question, *viz.*, whether the Detectives are covered by FLSA, the Port Authority requested that the district court amend its September 29 order to certify the question for interlocutory appeal under 28 U.S.C. § 1292(b) (1982). The court agreed, and on May 23, 1983, it amended its September 29 order accordingly. Shortly thereafter this court granted the Port Authority's petition for leave to file an interlocutory appeal pursuant to Fed.R.App.P. 5(a).[7]

Prior to the date on which the case was to be heard in this court, the Supreme Court heard argument in consolidated appeals of *Garcia v. San Antonio Metropolitan Transit Authority*, —— U.S. ——, 105 S.Ct. 1005, 83 L.Ed.2d 1016, and *Donovan v. San Antonio Metropolitan Transit Authority*, —— U.S. ——, 105 S.Ct. 1005, 83 L.Ed.2d 1016, which presented the question whether the minimum-wage and overtime

provisions of FLSA may be constitutionally applied to employees of publicly owned and operated mass transit systems. Because of the similarity between the question presented to the Supreme Court and the one presented here, we decided to hold this case under advisement pending the Court's decision. On February 20, 1985, the Supreme Court decided the *Garcia* and *Donovan* cases by overruling *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), and holding that no state employees should be exempted from coverage under FLSA. *See Garcia v. San Antonio Metropolitan Transit Authority*, —— U.S. ——, 105 S.Ct. 1005, 1020, 83 L.Ed.2d 1016 (1985). We then requested the parties to submit supplemental briefs addressing the question whether *Garcia* controlled this case. The parties disagreed as to the propriety of applying *Garcia* retroactively to serve as the governing law in this suit. This is the principal question we must now decide.

## II.

Before determining whether to apply *Garcia* retroactively so as to govern this case, we will review the state of the law prior to *Garcia* to explain how and why *Garcia* changed such law.

In 1974, Congress amended FLSA to subject almost all persons employed by the states and their political subdivisions to its wage and hour provisions. Fair Labor Standards Amendments of 1974, Pub.L. No. 93–259, 88 Stat. 55, 59. The National League of Cities and the National Governors' Conference challenged the amendments, contending that they unconstitution-

---

**6.** On November 15, 1982, the district court amended its September 29 order to deny Detectives' motion for partial summary judgment. The court concluded that there existed a material issue of fact as to whether the Detectives had actually worked overtime as defined by FLSA.

**7.** The May 23, 1983, district court order included the following language:

"In the opinion of the Court, this Order involves a controlling question of law, whether the provisions of the Fair Labor Standards Act relating to wage and hour are applicable

to the class of employees consisting of police detectives represented by the plaintiffs, and that an immediate appeal from the order will materially advance the ultimate termination of the litigation since a determination would finally resolve the legal issue relating to the applicability of the statute prior to the need for a lengthy proceeding establishing the damages, if any, due each member of the class should the statute be found to have been violated."

ally infringed upon states' sovereignty. The Supreme Court agreed that the determination of state employees' wages is an attribute of state sovereignty, *National League of Cities v. Usery*, 426 U.S. at 845, 96 S.Ct. at 2471, and held that Congress may not use the Commerce power to impose upon the states its choices regarding essential decisions in areas of traditional governmental functions. *Id.* at 855, 96 S.Ct. at 2476. The Court thus declared FLSA unconstitutional to the extent that it purported to apply to state employees performing such functions. *Id.* at 852, 96 S.Ct. at 2474. The *National League of Cities* principle was clarified in a later decision, *Hodel v. Virginia Surface Mining & Recl. Assoc.*, 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981), which set out a three-part test for determining when congressional regulation of state conduct exceeded its Commerce Clause power:

> "First, there must be a showing that the challenged statute regulates the 'States as States.' Second, the federal regulation must address matters that are indisputably 'attribute[s]' of state sovereignty.' And third, it must be apparent that the States' compliance with the federal law would directly impair their ability 'to structure integral operations in areas of traditional governmental functions.'"

*Id.* at 287–88, 101 S.Ct. at 2366 (citations omitted).

The question presented to the Court in *Garcia* concerned an application of the third part of the *Hodel* test. The Court was asked to determine whether applying FLSA to employees of the San Antonio Metropolitan Transit Authority would constitute an impairment of San Antonio's ability to operate in an area of traditional governmental functions. *Garcia*, 105 S.Ct. at 1007. Although the Court in *National League of Cities* had identified certain types of state operations, such as police protection and fire prevention, as "traditional governmental functions," 426 U.S. at 851, 96 S.Ct. at 2474, the Court left to the lower courts the task of determining whether other state operations were traditional.

In *Garcia*, rather than deciding whether a state's mass transit operations are traditional and thus exempt from FLSA, the Court overruled *National League of Cities*. *Garcia*, 105 S.Ct. at 1021. Writing for the majority, Justice Blackmun stated that, contrary to the Court's determination in *National League of Cities*, nothing in FLSA is destructive of state sovereignty or violative of the Constitution. *Id.* at 1020. Because the states participate in the federal system, he wrote, they can sufficiently protect themselves from federal laws that unduly infringe upon their sovereignty. *Id.*

We now turn to an analysis whether the law of *Garcia* or that of *National League of Cities* should be applied to the Detectives' claim.

### III.

■ It is a time-honored principle that courts will apply the law in effect at the time they decide a case. *See United States v. The Schooner Peggy*, 5 U.S. (1 Cranch) 102 (1801).[8] As a result, a recent decision is generally applied even to a dispute that arose prior to the court's holding. This approach reinforces the rubric advanced by Blackstone "that judges do not make but merely 'discover' law." *Marino v. Bowers*, 657 F.2d 1363, 1365 (3d Cir.1981) (in banc) (citing *Linkletter v. Walker*, 381 U.S. 618, 622–29, 85 S.Ct. 1731, 1733–38, 14 L.Ed.2d 601 (1965)). However, at times application of this retroactivity precept produces inequitable results, penalizing parties who ordered their affairs in reasonable reliance on a rule of law that was later invalidated. Such inequity is undesirable, not only because of the harm to the party involved, but also because it discourages adherence to contemporary laws. Consequently, it

---

8. This court has cited *The Schooner Peggy* recently in the following cases: *Perez v. Dana Corp., Parish Frame Div.*, 718 F.2d 581, 584 (3d Cir.1983); *DiSabatino v. National R.R. Passenger Corp.*, 724 F.2d 394, 396 (3d Cir.1984); *Williams v. Tri-County Growers, Inc.*, 747 F.2d 121, 124 (3d Cir.1984); *Black United Fund of N.J., Inc. v. Kean*, 763 F.2d 156, 160 (3d Cir.1985).

has been held that courts in certain circumstances appropriately may determine not to apply a decision retroactively.

The Supreme Court, in its decision in *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), adopted the following three-part analysis for determining the retroactive effect of new law in civil cases:

"In our cases dealing with the nonretroactivity question, we have generally considered three separate factors. First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants have relied, *see e.g., Hanover Shoe v. United Shoe Machinery Corp.*, [392 U.S. 481, 496, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968)], or by deciding an issue of first impression whose resolution was not clearly foreshadowed, *see, e.g., Allen v. State Board of Elections*, [393 U.S. 544, 572, 89 S.Ct. 817, 835, 22 L.Ed.2d 1 (1969)]. Second, it has been stressed that 'we must ... weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation.' *Linkletter v. Walker*, [381 U.S. 618, 629, 85 S.Ct. 1731, 1738, 14 L.Ed.2d 601 (1965)]. Finally, we have weighed the inequity imposed by retroactive application, for '[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the "injustice or hardship" by a holding of nonretroactivity.' *Cipriano v. City of Houma*, [395 U.S. 701, 706, 89 S.Ct. 1897, 1900, 23 L.Ed.2d 647 (1969)]."

*Chevron*, 404 U.S. at 106–07, 92 S.Ct. at 355. We therefore analyze this case under each of *Chevron's* three factors to determine whether *Garcia* should be given retroactive effect.

In this case, the defendant reasonably relied on the law in force at the time it conducted labor negotiations, and it is unfair to make it suffer because of an unforeseen change in that law. For this reason, we conclude that the decision in *Garcia v. San Antonio Metropolitan Transit Authority*, —— U.S. ——, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), should not be applied retroactively to this case.

### A.

The first part of the *Chevron* analysis counsels against retroactive application of a judicial decision if that decision establishes a new principle of law, either by overruling clear past precedent on which parties may have relied or by deciding an issue of first impression, the resolution of which had not been foreshadowed. *Chevron*, 404 U.S. at 106, 92 S.Ct. at 355. The Port Authority claims that the *Garcia* case clearly overturned the prior law governing this case, and that applying *Garcia* now would be inequitable because it relied on the prior law in taking the position during collective bargaining that the Detectives were not entitled to time and one-half for overtime.

As the Port Authority structured its contract with the Detectives, it was not in compliance with certain aspects of FLSA. The Port Authority's conclusion that the terms of this contract were exempt from FLSA was based on the Port Authority's assessment of two questions of law. First, the Port Authority, an entity created by bi-state compact, is a state for the purposes of the Tenth Amendment and the *National League of Cities* case. Second, the Detectives were performing a traditional state function because they were engaged in the activity of police protection. In order for the 1980 contract between the Port Authority and the Detectives to be exempt from FLSA under the *National League of Cities* doctrine, the Port Authority must be regarded as a state and the work of the Detectives must be a police protection activity. When *Garcia* overruled *National League of Cities*, these two issues became moot because all state activities became subject to FLSA.

We observe initially that the mere fact that the Supreme Court renders a deci-

sion overruling prior law is insufficient to satisfy the first part of the *Chevron* test. The party seeking nonretroactive application of the new decision must have relied on the prior law. Moreover, such reliance must have been reasonable. *Bronze Shields, Inc. v. N.J. Dept. of Civil Serv.*, 667 F.2d 1074, 1085 (3d Cir.1981), *cert. denied*, 458 U.S. 1122, 102 S.Ct. 2510, 73 L.Ed.2d 1384 (1982); *Singer v. Flying Tiger Line Inc.*, 652 F.2d 1349, 1353 (9th Cir.1981).

■ We have concluded that the Port Authority reasonably relied on the law prior to *Garcia* in determining that the instant contract would not be subject to FLSA. Neither party has cited case law holding that an authority created by a bi-state compact was not a state for the purposes of the Tenth Amendment. Moreover, as discussed in part IV(A) below, there are analogous cases under the Eleventh Amendment treating similar entities as states. It was reasonable for the Port Authority to rely on the statement in *National League of Cities* that police protection is a traditional state function[9] and to conclude that the Detectives are involved in police protection activity.[10] The dissent insists that because the Port Authority operates mass transit systems, and the status of such functions under *National League of Cities* has been unclear, the Authority was at risk in relying on the protection of that decision. However, the fact that the Authority includes mass transit among its many activities does not mean that the status of all its employees was in doubt. Even states and municipalities control entrepreneurial and other nontraditional public entities, but this does not affect the status of their traditional functions such as police protection. Indeed, the command of *National League of Cities* is to distinguish among those employees who perform traditional functions and those who do not.

We conclude that the *Garcia* decision, by overturning *National League of Cities*, overruled clear past precedent on which the Port Authority may have relied. Thus, the first prong of the *Chevron* test weighs against retroactive application of the *Garcia* decision.

### B.

The second *Chevron* factor (404 U.S. at 106–07, 92 S.Ct. at 355–56) requires us to consider the prior history of the new rule in question, and its purpose and effect, to determine if retroactive application will further or retard its operation.

The Port Authority contends that retroactive application of the *Garcia* decision is not necessary to insure future adherence to the decision. Now that the Supreme Court has ruled explicitly that no state employees are exempt from FLSA coverage, the Port Authority maintains, there is no reason to believe that states and municipalities will not comply in the future. We agree. The *Garcia* decision makes the law clear that, in the future, states must comply with FLSA. Regardless of how we decide this case, there is no reason to suspect that states would refuse to be bound by FLSA. This situation leaves us free to decide the instant case on its facts and equitable principles without concern for furthering or retarding the operation of *Garcia*. This second *Chevron* factor neither favors nor opposes the retroactive application of the *Garcia* decision.

**9.** The Court in *National League of Cities* stated:

"For even if we accept appellee's assessments concerning the impact of the [FLSA] amendments, their application will nonetheless significantly alter or displace the States' abilities to structure employer-employee relationships in such areas as fire prevention, police protection, sanitation, public health, and parks and recreation. These activities are typical of those performed by state and local governments in discharging their dual functions of administering the public law and furnishing public services."
426 U.S. at 851, 96 S.Ct. at 2474.

The Administrator of the Wage and Hour Division of the Department of Labor promulgated several regulations on December 21, 1979, which, in relevant part, restated and adopted the quoted language from *National League of Cities*. *See* 29 C.F.R. §§ 775.2(a), 775.4(a) (1985).

**10.** See discussion below in Part IV(C).

## C.

█ The third prong of the *Chevron* test requires us to consider any inequities that would result from retroactively applying the new law (404 U.S. at 107, 92 S.Ct. at 355). If retroactive application of *Garcia* would be inequitable, then this prong of the *Chevron* test would counsel against its retroactive application. As discussed above, the Port Authority apparently structured the contract with the Detectives based on the assumptions that it was a state for the purposes of *National League of Cities*, and that the Detectives were engaged in traditional state functions. In Part IV of this opinion, we decide that these assumptions are consistent with our interpretation of the law. In this section of the opinion, we analyze the Port Authority's actions when the employment agreement was entered into in 1980 to determine whether it would be inequitable to retroactively apply the *Garcia* opinion.

We decided in Part III(A) above that the two assumptions made by the Port Authority were reasonable.[11] The Port Authority was faced with a situation where it had to predict what the law was on two different issues. It made a decision and based its contract thereon. As discussed below, we think that not only was the Port Authority's assessment of the law reasonable, it was also correct. Over four years later, the *Garcia* decision overruled the entire relevant body of case law. Applying *Garcia* retroactively would punish the Port Authority for having made a decision which we agree is based on an accurate assessment of the law at the time such decision was made. In the normal business setting, a party must take action and cannot wait indefinitely for precise judicial resolutions; courts should recognize this fact and not punish unfairly those who engage in reasonable business decision-making.

Any public or private organization must manage its revenues to most efficiently provide services at the lowest cost. When involved in labor negotiations, the organization possesses estimates of how many hours it thinks the employees will work and how much money it has to compensate them. Within those parameters, the organization may opt for various pay structures. For example, some employees may be paid more than others; some compensation may be deferred; or employees may get a higher base pay in return for reduced overtime pay. It appears that the last situation was present in the instant case. Reasonably believing itself to be unshackled from the restrictions of FLSA, the Port Authority offered an attractive base pay that was balanced by lower overtime compensation. The Detectives agreed to this arrangement. The retroactive application of *Garcia* to this situation would give the Detectives increased overtime pay without any reduction in base pay. To allow the Detectives to get a pay raise premised on retroactive application of an unforeseen decision that was made almost two years after the *end* of the contract period would be inequitable to the Port Authority and would constitute a windfall to the Detectives. *See Morrison, Inc. v. Donovan,* 700 F.2d 1374, 1376 (11th Cir.1983).

Inasmuch as the Port Authority encountered an unresolved issue of law, on which it took a reasonable position, retroactive application of *Garcia* to foreclose its reliance on *National League of Cities* is not equitable. Employing the rule of *Garcia* in this case is thus contrary to both the first and third prongs of the *Chevron* test. *See Smith v. City of Pittsburgh,* 764 F.2d 188, 196 (3d Cir.1985); *see also Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 88, 102 S.Ct. 2858, 2880, 73 L.Ed.2d 598 (1982) (plurality opinion); *id.* at 92, 102 S.Ct. at 2882 (Rehnquist, J., concurring).

---

11. A full discussion of the merits of these two issues follows in Part IV of this opinion. The discussion is relevant both at this point and with respect to the first prong of the *Chevron* test. However, to avoid being repetitive, we do not address these issues until we reach the merits of the case. Our discussion here relates only to the possible inequities of applying the *Garcia* decision retroactively.

## IV.

We now turn to the *National League of Cities* case and its progeny to see if the Port Authority is exempt from FLSA with respect to overtime payments to the Detectives for the period from July 9, 1978, until July 3, 1983. As discussed above, the *National League of Cities* principle was clarified in *Hodel v. West Virginia Surface Mining & Recl. Assoc.*, 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981), where the Court said:

"First, there must be a showing that the challenged statute regulates the 'States as States.' Second, the federal regulation must address matters that are indisputably 'attribute[s]' of state sovereignty.' And third, it must be apparent that the States' compliance with the federal law would directly impair their ability 'to structure integral operations in areas of traditional governmental functions.'"

*Id.* at 287–88, 101 S.Ct. at 2366 (citations omitted). We examine each of these three requirements and conclude that the Detectives in the instant case are not covered by FLSA for the above period.

### A.

■ The first requirement of the *Hodel* test is that the challenged regulation must regulate "States as States." We must decide whether the Port Authority, an entity created by a bi-state compact, is a state for the purposes of the Tenth Amendment. This determination requires analysis because the Port Authority possesses certain federal incidents that a typical state agency lacks. However, after considering its federal traits and comparing them with its state traits, we conclude that the Port Authority is a "state" for the purposes of the first requirement of the *Hodel* test.

Article I, section 10, of the United States Constitution provides in relevant part: "No State shall, without the Consent of Congress, ... enter into any Agreement or Compact with another State...." U.S. Const. art. I, § 10. When the Port Authority was created in 1921, Congress consented to it. 42 Stat. 174 (1921). Similarly, when the Port Authority produced its Comprehensive Plan, it too was consented to by Congress. 42 Stat. 822 (1922). While Congress has not been involved in the structure or management of the Port Authority since 1922, there is language in both the Compact and the Comprehensive Plan that could be interpreted to provide for continuing control by Congress.[12] Arguably, this

---

12. The Compact as approved by Congress provides:

"ART. 18. The port authority is hereby authorized to make suitable rules and regulations not inconsistent with the Constitution of the United States or of either State, and subject to the exercise of the power of Congress, for the improvement of the conduct of navigation and commerce, which, when concurred in or authorized by the legislatures of both States, shall be binding and effective upon all persons and corporations affected thereby."

42 Stat. 178 (1921). The Compact also states:

"... That the consent of Congress is hereby given to the said agreement, and to each and every part and article thereof: *Provided,* That nothing therein contained shall be construed as impairing or in any manner affecting any right or jurisdiction of the United States in and over the region which forms the subject of said agreement.

"SEC. 2. That the right to alter, amend, or repeal this resolution is hereby expressly reserved."

42 Stat. 180 (1921).

The Comprehensive Plan approved by Congress states:

"... That, subject always to the approval of the officers and agents of the United States as required by Acts of Congress touching the jurisdiction and control of the United States over the matters, or any part thereof, covered by this resolution, the consent of Congress is hereby given...."

42 Stat. 822 (1922). The Comprehensive Plan further states:

"And the consent of Congress is hereby given ...: *Provided,* That nothing herein contained shall be construed as impairing or in any manner affecting any right or jurisdiction of the United States in and over the region which forms the subject of said agreement: *Provided further,* That no bridges, tunnels, or other structures shall be built across, under, or in any of the waters of the United States, and no change shall be made in the navigable capacity or condition of any such waters, until the plans therefor have been approved by the Chief of Engineers and the Secretary of War.

"SEC. 2. That the right to alter, amend, or repeal this resolution is hereby expressly reserved."

language could justify congressional control of the Port Authority through FLSA.

A similar issue was before the District of Columbia Circuit in *Tobin v. United States*, 306 F.2d 270 (D.C.Cir.), *cert. denied*, 371 U.S. 902, 83 S.Ct. 206, 9 L.Ed.2d 165 (1962). In that case, the District of Columbia Circuit reversed the conviction of the Executive Director of the Port Authority for contempt of Congress for failure to fully comply with a subpoena. The appellant argued that Congress lacked the power under the Compact Clause of the Constitution to "alter, amend or repeal" [13] its consent to the Compact which was the stated purpose of the investigating subcommittee. The court reversed the conviction, finding that the appellant had adequately complied with the subpoena. The court admitted its reluctance to resolve the issue of whether Congress could "alter, amend or repeal" the Compact.[14] We recognize the District of Columbia Circuit's reluctance and believe that this issue need not be resolved in this opinion. Our research has revealed no case holding that Congress possesses such a power.[15] We note today only that the power of Congress to "alter, amend or repeal"

is not currently part of the federal tradition. Since we are basing our conclusion that the Port Authority is a state for the purpose of the *Hodel* test on a balancing of its state and federal attributes, we feel it is not inappropriate to leave the resolution of Congress' power to "alter, amend or repeal" in this situation to another day.

One minor federal attribute of an interstate compact is that the compact itself becomes federal law. *Texas v. New Mexico*, 462 U.S. 554, 564, 103 S.Ct. 2558, 2565, 77 L.Ed.2d 1 (1983). *But see Petty v. Tennessee-Missouri Comm'n*, 359 U.S. 275, 285, 79 S.Ct. 785, 791, 3 L.Ed.2d 804 (1959) (Frankfurter, J., dissenting). This characterization serves not to allow Congress to sidestep the Tenth Amendment but rather to give the federal courts federal question jurisdiction (*see Cuyler v. Adams*, 449 U.S. 433, 438, 101 S.Ct. 703, 706, 66 L.Ed.2d 641 (1981)) and makes available the doctrine of preemption to prevent states from avoiding their compact obligations by citing contrary state law (*see West Virginia ex rel. Dyer v. Sims*, 341 U.S. 22, 28, 71 S.Ct. 557, 560, 95 L.Ed. 713 (1951).[16]

---

42 Stat. 826 (1922).

**13.** The phrase "alter, amend or repeal" comes from the 1921 Compact and the 1922 Comprehensive Plan. 42 Stat. 178 (1921); 42 Stat. 822 (1922). *See* note 12.

**14.** The court, after stating that such power is not conferred by the Compact Clause, expressed reluctance to find such an implied power:

"We have no way of knowing what ramifications would result from a holding that Congress has the implied constitutional power 'to alter, amend or repeal' its consent to an interstate compact. Certainly, in view of the number and variety of interstate compacts in effect today, such a holding would stir up an air of uncertainty in those areas of our national life presently affected by the existence of these compacts. No doubt the suspicion of even potential impermanency would be damaging to the very concept of interstate compacts."

*Tobin v. United States*, 306 F.2d at 273.

**15.** In *Riverside Irr. Dist. v. Andrews*, 568 F.Supp. 583 (D.Colo.1983), *aff'd*, 758 F.2d 508 (10th Cir. 1985), the court stated in dicta that "congress cannot unilaterally reserve the right to amend or repeal an interstate compact." 568 F.Supp. at 589. The only authority put forward for this

proposition was the *Tobin* case. The court held merely that a compact is not immune from subsequent federal legislation that affects it. The issue before the court was not whether compacts should be similarly treated as the states but rather whether compacts should be afforded a special status different than that to which the states were entitled. The court rejected the claim and found the legislation to be enforceable against the compact.

**16.** We note that the Supreme Court held that certain Port Authority employees were not state employees in *Helvering v. Gerhardt*, 304 U.S. 405, 423, 58 S.Ct. 969, 976, 82 L.Ed. 1427 (1938), in a case involving whether the federal income taxation of salaries of state employees contravened the Tenth Amendment. This doctrine was abandoned in *New York v. United States*, 326 U.S. 572, 66 S.Ct. 310, 90 L.Ed. 326 (1946). The decision in *Helvering* was based on a conclusion not that the Port Authority failed to constitute a state entity but that the Port Authority was a state-owned corporation rather than the state itself or a political subdivision. 304 U.S. at 423, 58 S.Ct. at 976. Though the Solicitor General contended that the Port Authority was not a state because it was not created by the states alone, the Court did not address this con-

These few federal attributes notwithstanding, we have concluded that the Port Authority possesses sufficient state attributes to qualify as a state entity for the purposes of the first prong of the *Hodel* test. From its inception sixty-five years ago, the Port Authority has been an entity of the two compacting states. New York and New Jersey each appointed commissioners to investigate the possibility of an agreement. 1917 N.Y.Laws Ch. 426, p. 1325; 1917 N.J.Laws Ch. 130, p. 288. A joint report of the commissioners was submitted to the respective governors in 1920. The following year the states appointed commissioners to negotiate a compact. 1921 N.Y.Laws Ch. 203, p. 841; 1921 N.J. Laws Ch. 151, p. 412. The Compact was ratified by the states before being sent to Congress for consent. 1921 N.Y. Laws Ch. 154, p. 492; 1921 N.J.Laws Ch. 151, p. 412. The Comprehensive Plan was also drafted and ratified by the states before consent was given by Congress. 1922 N.Y.Laws Ch. 43, p. 61; 1922 N.J.Laws Ch. 9, p. 25. The history of the Port Authority reveals little federal involvement beyond its mere consent to the Compact and the Comprehensive Plan.

Moreover, the Port Authority is administered as a state agency. Each state appoints six commissioners who are to be residents of the respective states. N.J. Rev.Stat. § 32:1–5 (1963); N.Y.Unconsol. Laws § 6405 (McKinney 1979). There is no provision for the federal government to appoint commissioners. Since 1922, Congress has not consented to any state legislation regarding the Port Authority's structure and functions.[17] We view the Port Authority as an entity run as an independent state agency with little or no supervision by the federal government.

Although the issue we face today has not been resolved in the context of the Tenth Amendment and the *National League of Cities* case, there are cases involving the Eleventh Amendment[18] that we find instructive. Courts have held that entities created by compact qualify as a state for the purpose of enjoying the immunity of the Eleventh Amendment. For example, in *Howell v. Port of New York Authority*,[19] 34 F.Supp. 797 (D.N.J.1940), the court was faced with the argument that the Port Authority was a municipal corporation and not a state agency. The court discussed the composition of the Port Authority and its role of serving primary governmental functions of the states before concluding:

"The Port Authority, a bi-state corporation, ... is a joint or common agency of the states of New York and New Jersey. It performs governmental functions which project beyond state lines, and it is immune from suit without its consent. 34 F.Supp. at 801.

More recently, the Second Circuit was faced with the same issue involving the Palisades Interstate Park Commission, an entity formed by compact between New York and New Jersey. The court noted that any judgment would have to be paid from the state treasuries and stated: "We fail to perceive any reason why a bi-state commission cannot, when sued in the federal court, enjoy the Eleventh Amendment immunity of its signatory states." *Trotman v. Palisades Interstate Park Com'n*, 557 F.2d 35, 38 (2d Cir.1977).

The Supreme Court had opportunity to address the issue in *Petty v. Tennessee-*

---

tention. *See* 304 U.S. at 429, 58 S.Ct. at 979 (Butler, J., dissenting).

**17.** Pursuant to the Comprehensive Plan, approval for bridges and tunnels has been granted by the War Department. 42 Stat. 822, 826 (1922). This review was apparently based on the federal concern for supervising navigation.

**18.** The Eleventh Amendment provides:
"The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."
U.S. Const., amend. XI.

**19.** The Port Authority was originally called the "Port of New York Authority." As of July 1, 1972, the name was changed to the "Port Authority of New York and New Jersey." N.J.Rev. Stat. § 32:1–4 (West Supp.1985); N.Y.Unconsol. Laws § 6404 (McKinney 1979).

*Missouri Comm'n,* 359 U.S. 275, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959), but instead assumed, *arguendo,* that the suit be treated one as against a state. The Court then found that the commission had waived any immunity it might have had.[20] In the Eighth Circuit, in the same case, the court had reached the issue and found "the defendant Commission was the agency or instrument of the two States and not an entity separate and apart from the States." *Petty v. Tennessee-Missouri Bridge Commission,* 254 F.2d 857 (8th Cir.1958), *rev'd on other grounds,* 359 U.S. 275, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959).

These Eleventh Amendment cases demonstrate that the courts are willing to treat entities created by interstate compacts as states.[21] We agree that in the analogous situation presented in this case that the Port Authority, an entity created by an interstate compact, should be treated as a state for the purposes of the *National League of Cities* doctrine.[22]

## B.

The second requirement of the *Hodel* test is that the federal regulation must address matters that are indisputably attributes of state sovereignty. 452 U.S. at 287–88, 101 S.Ct. at 2365–66. The attribute in question in the instant case is overtime wages paid to employees. The *National League of Cities* case makes clear that overtime wages are an attribute of state

sovereignty. The Court concluded: "Our examination of the effect of [applying FLSA] to the States and their political subdivisions, satisfies us that both the minimum wage and the maximum hour[23] provisions will impermissibly interfere with the integral governmental functions of these bodies." 426 U.S. at 851, 96 S.Ct. at 2474. We conclude that the second requirement of the *Hodel* test is met.

## C.

The third requirement of the *Hodel* test is that it must be apparent that the states' compliance with the federal law would directly impair their ability to structure integral operations in areas of traditional governmental functions. 452 U.S. at 288, 101 S.Ct. at 2366. We conclude that the Detectives are engaged in a traditional governmental function.

In *National League of Cities,* the Court stated:

"[The application of FLSA to the States will] significantly alter or displace the States' abilities to structure employer-employee relationships in such areas as fire prevention, *police protection,* sanitation, public health, and parks and recreation. These activities are typical of those performed by state and local governments in discharging their dual functions of administering the public law and furnishing public services. Indeed, it is functions such as these which govern-

---

**20.** The Court was split into three groups of three justices. The three dissenting justices could find no waiver of immunity. The three concurring justices joined with the opinion of the Court but clarified that the Court had not reached the issue of whether bi-state commissions can be immunized under the Eleventh Amendment.

**21.** The Supreme Court rejected a *per se* rule in *Lake Country Estates v. Tahoe Regional Planning Agency,* 440 U.S. 391, 400–01, 99 S.Ct. 1171, 1176–77, 59 L.Ed.2d 401 (1979), stating that each compact must be considered based on its own attributes to determine if it is entitled to Eleventh Amendment immunity. This reasoning is applicable to Tenth Amendment cases too. We do not today hold that all entities created by interstate compacts are states for the purpose of

*National League of Cities.* Our holding is limited to finding that the Port Authority is a state for the purposes of resolving the instant case.

**22.** *See also* Derian, *Defining the 'State as State': Is a Nonprofit Corporation Under Contract with a State to Perform an Integral Government Function Entitled to Immunity from the Fair Labor Standards Act under the National League of Cities?,* 10 Hasting Const.L.Q. 877, 913 (1983) ("Simply stated, an entity which is government owned, managed by directors appointed by government officials, and statutorily designated as a public corporation should be presumed to be governmental") (footnotes omitted).

**23.** "Maximum hour" as used in FLSA and *National League of Cities* is essentially synonymous with overtime wages.

ments are created to provide, services such as these which the States have traditionally afforded their citizens."

426 U.S. at 851, 96 S.Ct. at 2474 (emphasis added) (footnote omitted). Thus, we are instructed that police protection is a traditional governmental function. If the Detectives are performing a police function, then the third requirement of the *Hodel* test (452 U.S. at 288, 101 S.Ct. at 2366) is satisfied.[24]

Notwithstanding the fact that the Detectives are not uniformed patrolmen, we believe that they are clearly involved in the activity of police protection. The detective who appears at the scene of the crime, interviews witnesses, and pursues suspects is at the very heart of our system of police protection. Webster's New Collegiate Dictionary (p. 882, 1979 ed.) defines "police" to include "the department of government charged with prevention, detection and prosecution of public nuisance and crimes." This language indicates a scope encompassing more than just a patrolman—it includes the people investigating reported crimes.[25] Moreover, as members of the Port Authority police force, the Detectives "have all the powers conferred by law on police officers or constables in the enforcement of laws of this state and the apprehension of violators thereof." N.J.Stat.Ann. § 32:2-25 (1963). *Accord,* N.Y.Crim.Proc.L. § 1.20, subdivision 34(k) (McKinney 1981); *State v. Cohen,* 73 N.J. 331, 337, 375 A.2d 259, 262 (West 1977). *See also Grand Rapids & I. Ry. Co. v. King,* 41 Ind.App. 701, 707, 83 N.E. 778, 780 (1908) (a detective is a "policeman whose business is to detect rogues by adroitly investigating their haunts and habits") (citing Webster's Dict.); *Com., Hum. Rela. Com'n v. Beaver Falls City Council,* 469 Pa. 522, 527, 366 A.2d 911, 914 (1976). For these reasons, we conclude that plaintiffs as detectives are engaged in police protection which is a traditional governmental function for the purposes of the third requirement of the *Hodel* test.

## V.

In light of our decision that all three requirements of the *Hodel* test are satisfied, we hold that the application of the overtime wage provisions of the Fair Labor Standards Act to the plaintiff-Detectives during the period from 1978 to 1983 would be a violation of the doctrine announced by the Supreme Court in *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1975). We will reverse the district court's denial of the Port Authority's motion to dismiss and will remand the case to the district court with directions to dismiss this civil action (No. 80-03307, D.N. J.).

BECKER, Circuit Judge, dissenting.

I believe the majority has misapplied the *Chevron* test to this case. Unlike my colleagues, I find that application of the first and second prongs of the test weighs in favor of retroactive application of *Garcia.* In my view, only the third prong may favor non-retroactive application, but, in weighing the equities as the third prong requires, I do not find them definite or significant enough to tip the balance. Because I conclude that *Garcia* should be the governing law in this case, I respectfully dissent.

**24.** We need not decide whether all Port Authority employees are performing traditional governmental functions. The issue before us is limited to the plaintiffs who are detectives. We heed the advice of Judge Adams:

"In resolving the issues raised, we must be mindful that our judicial power extends only to deciding the specific case presented to us. While attempting to maintain the essential role of federal courts both in preserving a healthy relationship between the nation and the states and in protecting constitutional rights, the federal judiciary must be alert to

the dangers inherent in deciding cases more broadly than required by the precise issues presented. The goal must be reasoned, principled results based solely upon grounds necessary to the disposition of the controversy." *Conover v. Montemuro,* 477 F.2d 1073, 1083-84 (3d Cir.1973) (Adams, J., concurring). *See also* 477 F.2d at 1093.

**25.** We decide only the issue presented to us today. We express no opinion as to whether other officials, such as prosecutors, are engaged in the police protection.

I.

As the majority has noted, the fact that the Supreme Court renders a decision overruling prior law is insufficient to satisfy the first part of the *Chevron* test. Rather, the party seeking nonretroactive application of the new decision must have relied on the prior law, and such reliance must have been reasonable. Where application of prior law has been erratic and inconsistent, a subsequent decision overruling that law cannot be said to have overruled clear past precedent on which the parties may reasonably have relied. *See Smith v. City of Pittsburgh,* 764 F.2d 188, 194 (3d Cir. 1985); *Perez v. Dana Corp., Parish Frame Div.,* 718 F.2d 581, 585 (3d Cir.1983).

Here, although the Supreme Court's decision in *Garcia* to overrule *National League of Cities* was hardly predictable, the application of the *National League of Cities* principle to cases involving state employees not specifically identified by the Court as performing traditional governmental functions had been quite erratic and inconsistent. Indeed, this inconsistency in application served as a primary reason for the Court's decision to overrule *National League of Cities.*[1] *Id.* 105 S.Ct. at 1016. The Court observed that under the traditional governmental function test set forth in *National League of Cities* and elaborated upon in *Hodel v. West Virginia Surface Mining and Recl. Assoc.,* 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981), courts had experienced insurmountable difficulties identifying those governmental functions that were traditional and those that were not and that, as a result, they had come to fundamentally inconsistent conclusions.

The majority is unmoved by the erratic prior law on this point. It points to language in *National League of Cities* and subsequently promulgated Department of Labor regulations which explicitly consider "police protection" as a "traditional governmental function," and concludes that the detectives were clearly excluded from coverage of the FLSA. Therefore, the majority concludes, the Port Authority's reliance on *National League of Cities* (and the Department of Labor regulations) in denying overtime pay to the detectives was reasonable.

For me, the matter is not so simple. The Port Authority acts to a significant extent as a transit authority.[2] Department of Labor regulations existing prior to the execution of the collective bargaining agreement at issue here specifically identified the operation of local mass transit systems as not being a traditional governmental function.[3]

---

1. *Compare Amersbach v. City of Cleveland,* 598 F.2d 1033, 1037 (6th Cir.1979) (operation of an airport is traditional *with Hughes Air Corp. v. Public Utilities Comm'n,* 644 F.2d 1334, 1340 (9th Cir.1981) (regulation of air transportation is not traditional); *compare Enrique Molina-Estrada v. Puerto Rico Hwy. Auth.,* 680 F.2d 841, 845 (1st Cir.1982) (building and maintaining public roads is traditional *with Friends of the Earth v. Carey,* 552 F.2d 25, 38 (2d Cir.) (regulating traffic on public roads is not traditional), *cert. denied,* 434 U.S. 902, 98 S.Ct. 296, 54 L.Ed.2d 188 (1977); *compare N.L.R.B. v. Highview, Inc.,* 590 F.2d 174, 178 (5th Cir.1979).(operation a nursing home is traditional) *with Bonnette v. California Health & Welfare Agency,* 704 F.2d 1465, 1472 (9th Cir.1983) (provision of in-house domestic service for aged and handicapped is not traditional).

2. In addition to operating bridges, tunnels, seaports, airports, and other facilities of transportation and commerce, the Port Authority operates a commuter railroad through its wholly owned subsidiary, the Port Authority Trans Hudson

Corporation. *See* N.Y.Unconsol.Laws §§ 6603, 6612 (McKinney 1979); N.J.Stat.Ann. §§ 32:1–35.52, 32:1–35.61 (West 1963 & Supp.1985). *Cf.* 29 C.F.R. § 775.2:

3. On December 21, 1979, the Administrator of the Wage and Hour Division of the Department of Labor promulgated regulations giving its interpretation of non-traditional governmental functions:

§ 775.2 Special enforcement policy concerning States and political subdivisions.

(a) On June 24, 1976, the United States Supreme Court ruled in *National League of Cities, et al. v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 that the minimum wage and overtime compensation provisions of the Fair Labor standards Act (FLSA) are not constitutionally applicable to the integral operations of the States and their political subdivisions in areas of traditional governmental functions. Such areas include, among others, schools and hospitals, fire prevention, police protection, sanitation, public health, and

Subsequent decisional law confirmed this position. *See United Transportation Union v. Long Island R. Co.*, 455 U.S. 678, 686, 102 S.Ct. 1349, 1354, 71 L.Ed.2d 547 (1982); *Kramer v. New Castle Area Transit Authority*, 677 F.2d 308, 310 (3d Cir. 1982), *cert. denied*, 459 U.S. 1146, 103 S.Ct. 786, 74 L.Ed.2d 993 (1983). The majority suggests that the Port Authority should be treated like a state or municipality, with its employees treated disparately according to their functions. While this approach is plausible, it is by no means self-evident, and there is no caselaw support for it. Thus there was no clear authority for the proposition that the detectives were excluded from FLSA coverage.

Moreover, although appellees are authorized to serve as law-enforcement officers by statutes of New York and New Jersey, they are employed by the Port Authority and not by the two states or any of their municipalities. As such, they perform some duties that would not be performed by policemen working directly for New York, New Jersey, or a municipality therein, including conducting character investigations of Port Authority employees, enforcing Port Authority regulations, and investigating complaints against Port Authority personnel. Thus, appellees are not necessarily the type of policemen that the Supreme Court intended to exclude from coverage of the FLSA by the *National League of Cities* decision.[4]

In view of the inconsistent prior law, *see supra* note 1, and the strong indication in the case law that transit workers were not covered, the Port Authority should have recognized the precariousness of its position that its detectives were exempt from FLSA coverage under *National League of Cities* jurisprudence. By failing to comply with the FLSA's overtime requirements, the Authority was at risk that it might be found liable for overtime pay by a subsequent judicial determination that the detectives were covered by the FLSA.

I conclude, therefore, that it was not reasonable for the Port Authority to have relied on the law as it existed prior to *Garcia* for the position that its police detectives were exempt from FLSA coverage. The first of the *Chevron* factors thus weighs in favor of the retroactive application of the *Garcia* decision.

## II.

The second *Chevron* factor requires us to consider the prior history of the new rule in question, and its purpose and effect, to determine if retroactive application will further or retard its operation.

The majority's analysis of the second prong of *Chevron* is limited to whether that retroactive application of the *Garcia* decision would discourage future adherence to the decision. I agree with the majority that, given the Supreme Court's explicit ruling that no state employees are exempt from FLSA coverage, there is no reason to believe that states and municipalities will not comply in the future. This finding does not, however, exhaust the inquiry as to whether retroactive application of *Garcia* will retard or further the operation of that holding.

---

parks and recreation. They do not include, amoung [sic] others, the operation of a railroad by a State. 426 U.S. at 854, n. 18, 96 S.Ct. at 2475 n. 18.

**§ 775.3  Nontraditional functions of States and their political subdivisions.**

(a) In the *National League* decision it was made clear that the operation of a railroad by a State or its political subdivision is not an integral operation in the area of traditional governmental functions. 426 U.S. 833, 854 n. 18, 96 S.Ct. 2465, 2475 n. 18.

(b) For the purpose of the notice referred to in § 775.2(b), the Administrator has determined that the following functions of a State

or its political subdivisions are not traditional.... The date listed after each function is the date of original publication in the *Federal Register* ...

.   .   .   .   .

(3) Local mass transit systems December 21, 1979.

29 C.F.R. § 775.3 (1984).

**4.** Given my view of the appropriate disposition of this case, I need not express an opinion on the other aspects of the majority's analysis in Part IV.

I believe that non-retroactive application of *Garcia* results in the unseemly spectacle of the court's deciding this case under a pre-existing analytical framework that the Supreme Court has found to be unsound in principle and unworkable in practice.[5] *Garcia*, 105 S.Ct. 1016. Thus, in Part IV of its opinion the majority is forced to apply an analysis that the Supreme Court has denigrated as "not faithful to the role of federalism in a democratic society" and "disserve[ing] principles of democratic self-governance." *Id.* at 1015, 1016. Moreover, this court's continued recognition of exemptions in the coverage of the FLSA that were created solely by the judicial branch and have since been invalidated would constitute an unjustifiable intrusion into the legislative branch's authority and an unwarranted divergence from congressional intent.

For these reasons, I believe that retroactive application would further the operation of the new rule; the second prong of the

*Chevron* test, therefore, also points strongly in the direction of retroactive application of *Garcia*.[6]

### III.

Part III of the *Chevron* test requires consideration of any inequities that would result from retroactively applying the new law. First, the Port Authority argues that it relied in good faith on *National League of Cities*, as well as Department of Labor regulations, in maintaining its position that plaintiffs were not covered under the FLSA, and thus that it would be inequitable for the court to now enforce the FLSA retroactively. As I have explained, given the uncertainty of the pre-existing law, the Port Authority was at risk that the detectives might not be exempted from FLSA coverage; hence it would not be manifestly unjust if the Authority were found liable under the FLSA as a result of our directing the district court to apply *Garcia* in this case.[7]

5. It may seem as though this factor would always suggest retroactive application of a Court decision. That is not so: sometimes the Court overturns prior law as the result of changed circumstances rather than because the earlier decision was analytically unsound and unworkable.

6. I disagree with the Port Authority's argument that the retroactive application of *Garcia* might retard the purposes of the FLSA because huge lump-sum backpay awards resulting from retroactively applying FLSA wage and hour requirements would be inconsistent with Congress's intent to impose the FLSA burden on states gradually. First, the Port Authority's assertion that Congress intended to phase in FLSA coverage over state and local governments gradually is incorrect. The 1974 FLSA amendments specified that FLSA coverage over the employees of state and local governments begin immediately, as of May 1, 1974. H.Conf.Rep. No. 953, 93rd Cong., 2d Sess. 30, *reprinted in* 1974 U.S.Code Cong. & Ad.News 2811, 2867. Furthermore, retroactive application of *Garcia* so as to compel states to compensate workers for past work according to the provisions of the FLSA would not place any greater financial burden on the states than that which was originally contemplated by Congress. Indeed, because suits by state employees to enforce FLSA provisions are subject to a two-year statute of limitations, *see* 29 U.S.C. § 255(a) (1982), states can be potentially liable for backpay only for two years prior to the date

the *Garcia* decision was rendered. (The Act also provides for a three-year statute of limitation for willful violations of the FLSA. *See* 29 U.S.C. § 255(a) (1982)). Congress, on the other hand, intended the FLSA's overtime provision to apply to state employees beginning May 1, 1974. *See* Fair Labor Standards Amendments of 1974, Pub.L. No. 93–259 §§ 6, 29, 88 Stat. 55, 58–59, 76. Thus, retroactive application of *Garcia* to state employees' suits under the FLSA will result in a financial burden to states that is much less than what the states would have borne had they complied with the FLSA beginning in 1974 as Congress had intended.

7. Under my view of the case, even if *Garcia* is applied retroactively, the Port Authority may still be able to avoid liability to the detectives under the FLSA by asserting the Portal-to-Portal Act good-faith defense. This defense is designed to protect from liability employers who acted in reliance on an interpretation of the law by a governmental agency, even if the agency's interpretation is subsequently determined to be incorrect. *Equal Employment Opportunity Comm'n v. Home Ins. Co.*, 672 F.2d 252, 263 (2d Cir.1982). An employer who relies in good faith upon a written administrative regulation, order, or ruling of the Administrator of the Wage and Hour Division of the Department of Labor will not be subject to liability for its failure to pay minimum wages or overtime compensation as required by the FLSA. *See* 29 U.S.C. § 259 (1982). My conclusion that the

Second, the Port Authority contends that a backpay award compensating appellees one and one-half times their regular hourly rate for past overtime hours is inappropriate because it would constitute a windfall. According to the Port Authority, the police detectives were paid 25% an hour more than other Port Authority police and accepted this premium in exchange for not receiving time and one-half for overtime, which was being paid to the other police. Thus, Port Authority maintains that retroactive application of *Garcia* would result in a financial windfall to the detectives. *See Morrison, Inc. v. Donovan,* 700 F.2d 1374, 1376 (11th Cir.1983). The detectives deny that their premium hourly rate of pay was made in lieu of overtime, asserting that this rate was greater than that of other Port Authority police because they performed extra duties.

It is thus unclear whether retroactive application of *Garcia* would result in a windfall (though the majority, without explanation, adopts the Port Authority's position on this point). This poses no problem in any event because retroactive application of *Garcia* does not require that we stipulate the base hourly rate that the district court should use in determining a backpay award for overtime compensation if the Port Authority is found to be liable. Rather, I believe the district court should determine whether the detectives agreed to a higher hourly rate in lieu of time and one-half for overtime and, therefore, that the parties would have agreed to a different base pay had overtime been included in the

wage package. The court would take such facts into account when determining the appropriate base rate with which to calculate overtime compensation. My proposed application of *Garcia* to this case, therefore, would not subject the Port Authority to an unjustly large assessment of damages and provide the detectives with a windfall.[8]

Finally, the majority believes that a lump-sum backpay award to the detectives for past overtime would be inequitable to the Port Authority. I recognize that the potential liability of Port Authority may be significant, and I do not consider this factor lightly. Nevertheless, the amount of such liability is highly speculative at this stage,[9] and ought to be balanced against the inequities to workers occasioned by their lower wages, a situation resulting from the subsequently overturned *National League of Cities* holding. Moreover, my concern about Port Authority's potential financial liability is tempered by the two-year limitations period for FLSA actions of this sort, *see supra* n. 6. Thus, the potential financial hardship imposed on the Port Authority is not definite or significant enough to tip the balance in favor of a non-retroactive application of *Garcia*.

## IV.

I conclude, therefore, that application of the *Chevron* test dictates that the Supreme Court's *Garcia* decision should serve as the governing law in this case. I would thus answer the district court's certified ques-

---

law was too unsettled to bar retroactive application does not decide the validity of a Portal-to-Portal defense. Thus, on my view, the Port Authority would be able to assert this defense on remand, and, if the district court found the existence of such good-faith reliance on Port Authority's part, no FLSA liability would ensue.

8. In a similar vein, I reject the Port Authority's argument that, if it is found liable to the detectives for back overtime wages as a result of a retroactive application of *Garcia,* it will also incur a liquidated damages penalty in an amount equal to the amount of back wages owed. I recognize that an employer found liable under the FLSA for unpaid overtime compensation is subject to a liquidated damages

penalty in an amount equal to the amount of unpaid compensation. *See* 29 U.S.C. § 216(b) (1982). Nevertheless, the assessment of this penalty is discretionary. The district court may award no liquidated damages if an employer sufficiently demonstrates that it had reasonable grounds for believing that its actions did not violate the FLSA. *See* 29 U.S.C. § 260 (1982). Thus, even if found liable, the Port Authority would not necessarily be subject to a liquidated damages penalty.

9. The parties have not been able to quantify with any degree of accuracy the amount of potential damages in this action because they conducted only limited discovery before the case was certified for an interlocutory appeal.

tion by holding that the wage and hour provisions of the FLSA apply to the class of Port Authority employees consisting of police detectives represented by the plaintiffs.